70  442
114  497
d114  536
d114  537
114  546

70  442
129  518

70  442
131    8

70  442
143  285
144  146

## THE STATE v. HOCKETT.

1. **Murder**: POWER OF JURY TO FIX PENALTY: CONSTITUTIONALITY OF STATUTE. Section 2 of chapter 165, Laws of 1878, as amended by chapter 2, Laws of 1880, which authorizes the jury to say whether a defendant who is found guilty of murder in the first degree shall be punished by death, or by imprisonment for life at hard labor in the penitentiary, is not unconstitutional on the ground that all judicial power is vested in the courts, and that they, and not the jury, must declare the law.

2. ————: INSANITY AS A DEFENSE: RELATION OF INSANITY TO CRIME. Where insanity is relied upon as a defense to a criminal charge, the alleged insanity and the alleged crime must be connected, the one with the other, and the latter be the offspring of the former, in order to have the effect of rightfully absolving the defendant from responsibility for the alleged crime.

3. ————: ————: EXPERT TESTIMONY: WEIGHT OF: INSTRUCTION. In such case, the court properly instructed the jury as to the testimony of medical experts, given in answer to hypothetical questions, substantially as follows: That such testimony is of greater or less weight, depending on the skill, knowledge and experience of the witness, and his acquaintance with the subject under investigation; that such evidence may be found quite reliable and satisfactory, or the reverse, and entitled to little, if any, consideration; that such evidence, made up largely of mere theory and speculation, and which suggests mere possibilities, ought never to be allowed to overcome clear and well established facts; and that medical theorists have propounded doctrines respecting insanity, as an excuse for criminal acts, which a due regard for the safety of the community, and an enlightened public policy, must prevent juries from adopting as a part of the law of the land.

4. ————: PREMEDITATION: INSTRUCTION. An instruction in the following language: "It is not necessary that premeditation or intent to kill should have existed for any particular length of time before the killing. If it actually exists at the time of the killing, and the killing is the result of a formed and determined design to take life    *    *    * then the killing is willfully, deliberately and premeditatedly done, within the meaning of the law,"—criticised, but *held* not erroneous as conveying the idea that the intent to kill need not exist for *any* time prior to the killing. ADAMS, Ch. J., *dissenting*. [Compare par. 8 of *State v. Sopher, post*, p. 494. REPORTER.]

5. ————: PRESUMPTION OF MALICE FROM DEADLY WEAPON. Where one assaults another with a deadly weapon, likely to produce death, the law presumes malice, in the absence of proof, either direct or by circumstances, to the contrary.

6. **Evidence:** EXCLUSION OF: ERROR WITHOUT PREJUDICE. The exclusion of evidence offered to establish a point already established without controversy is, at most, error without prejudice.

7. **Murder:** INSANITY: OPINION OF NON-EXPERT. Where the mother of defendant had testified that he had fits when two years old, *held* that she was not competent to state what effect the fits had on him—whether they rendered him unconscious or not. She could only state his appearance and actions at such times.

8. **Evidence:** QUESTIONS INCOMPETENT ON THEIR FACE: DUTY OF COUNSEL. Where questions propounded to a witness are incompetent on their face, the court may rightly exclude them unless counsel show their competency by stating what they expect to establish by them.

9. **Murder:** INSANITY: EVIDENCE: INSTRUCTION. The following instruction upon the evidence of insanity as a defense is approved. "In order to establish insanity, it is not necessary that the proof be direct and positive, but it may be shown by such facts and circumstances as convince the mind of its existence, the same as any other fact. But when the claim set up as a defense is unusual, unnatural, and out of the ordinary course of affairs, you are not required to take the same for granted upon slight evidence, nor should you so find, except upon evidence of a reliable character, and which satisfies you that the defense has been made out."

10. **Manslaughter:** DEFINITION. One who takes the life of another in the heat of blood or passion, upon a sudden quarrel, and upon reasonable provocation, and without malice express or implied, and yet without lawful justification or excuse, is guilty of manslaughter, unless he is not accountable for the act because of insanity.

11. **Homicide:** MURDER OR MANSLAUGHTER: PROVOCATION. The following instructions are approved: "No mere words, however abusive or insulting, will justify an assault, or constitute sufficient provocation to reduce to manslaughter what would otherwise be murder. If the illegal homicide, if any there was, was effected with a deadly weapon, the provocation must have been great, indeed, to lower the offense from murder to manslaughter." "The fact, if it be a fact, that decedent had previously been criminally intimate with defendant's sister, or the defendant had reason to believe he had been so intimate, would not constitute the provocation referred to in these instructions."

*Appeal from Mahaska District Court.*

TUESDAY, DECEMBER 21.

INDICTMENT for murder in the first degree. The jury found the defendant guilty as charged in the indictment, and that he should be punished by imprisonment in the penitentiary

for life, at hard labor; and judgment was accordingly entered. The defendant appeals.

*Bolton & McCoy, John F. Lacey* and *Liston McMillen,* for appellant.

*A. J. Baker, Attorney-general,* for the State.

SEEVERS, J.—I. It is provided by statute that, "upon trial of an indictment for murder, the jury, if they find the defend-

1. MURDER: power of jury to fix penalty: constitutionality of statute.

ant guilty of murder in 'the first degree, must designate in their verdict whether he shall be punished by death, or imprisonment for life, at hard labor, in the penitentiary." McClain's St., p. 972, § 2. The constitution provides that "the judicial power shall be vested in a supreme court, district court, and such other courts, inferior to the supreme court, as the general assembly shall, from time to time, establish. The district court shall consist of a single judge. Article 5, §§ 1, 5, Const. It is insisted, with much earnestness, by counsel for the defendant, that the statute which authorizes the jury to say whether a defendant, who is found guilty of murder, shall be punished by death, or imprisonment at hard labor, is unconstitutional, because it conflicts with the foregoing provisions of the constitution, the argument being that all judicial power is vested in the courts, and that they, and not the jury, must declare the law; "that a judgment, though pronounced by the judge, is not his sentence, but the sentence of the law. It is the certain and final conclusion of the law, following upon ascertained premises." Conceding these propositions, the inquiry, then, is, what is "law?" It is, and must be, such rules as are prescribed by the supreme power. How is this to be ascertained? In this state it is the general assembly or law-making power that enacts law. The courts simply pronounce judgment in accordance with the declared will of the general assembly. In so doing, they declare the law. They cannot make law, but it is their

province to pronounce judgment according to law. It is fundamental that the constitution does not confer any power on the general assembly, but is restrictive only. It, however, gives to the courts judicial power, and it will be conceded that such power is exclusive. But such power only confers on the courts the power to declare the law as enacted by the general assembly; and, as applied to the case at bar, it is the province and duty of the court to pronounce judgment on the verdict of the jury; for such is the law. The constitution does not prohibit the general assembly from enacting such a law as the one in question, and therefore it had the power to enact it. We are of the opinion that the statute under consideration is not unconstitutional.

II. It is insisted that the defendant was insane at the time of the homicide, and that the instructions of the court upon the subject of insanity are erroneous.

2. ——— : insanity as a defense: relation of insanity to crime. It is proper that the material facts should be stated. The defendant lived some fifteen miles east of Oskaloosa, and, a day or two preceding the homicide, he learned that the deceased and his sister had gone to Oskaloosa; and he assumed, perhaps justly, that their conduct towards each other was not what it should be, and that improper relations existed. He followed them to Oskaloosa, but he was not able to find them, and, they having returned in the direction of home, he followed. They separated, and he stated to more than one person that he intended to shoot the deceased. He met or saw the deceased walking along a road, and the defendant told him to "halt," and pulled a revolver out of his pocket, and started towards the deceased; and the latter hallooed, "For God's sake, don't shoot me!" The defendant shot at the deceased, who ran, and the defendant after him, and then he shot again. The deceased ran behind an oak tree, and the defendant, who was two or three steps therefrom, told the deceased to come out, and tell what he had done. The deceased came from behind the tree, kneeled down, and said: "For God's sake, don't shoot me!

It was not my fault; it was the girl's. I was tight. I knew nothing about it." The defendant again shot at the deceased, who again got behind the tree, and hallooed: "For God's sake, do not shoot me any more! You have shot me through my eye, and through my heart. What more can you do than to take my life?" The defendant said again, as he had previously: "You started to run off with my sister," and shot again, and the deceased fell to the ground, when the defendant jumped on him, and stamped him in the face, and turned to go away, and said to a witness: "Don't worry, El.; he is done for. Come up to the house."

The actions and conduct of the defendant in pursuing the deceased, after the homicide, together with the brutality exhibited, and his acts and conduct, are relied on as sustaining the defense of insanity. It is also claimed that there was evidence showing that, when the defendant was about three years old, he had fits while teething, and that his grandmother was insane at one time, brought on by menstrual difficulties, when the change of life occurred. She recovered, however, three or four months before she died. The instructions on the question of insanity are quite lengthy. We do not think it necessary to set them out in full, but will notice the objections urged by counsel.

*First.* It is said that, the court, "over and over again instructed the jury that, although the defendant was insane at the time of the homicide, that would not be a defense." This is a grave mistake, inadvertantly made, we will assume.

*Second.* "The court took the theory, in effect, that the defendant might be insane on one subject, and not another." What the court did say is as follows: "It does not necessarily follow that, if defendant was insane, the alleged killing * * * was the result of such insanity; or, if he is possessed of an insane impulse, that he could not have successfully resisted it. The insanity which absolves one for acts which otherwise would be criminal must be of that character which caused the act, and irresistibly compelled it. If

the defendant was afflicted with insanity, but this has no connection with the alleged criminal act, or if it did, yet he could have controlled his acts, and refrained from perpetrating them, then he cannot be guiltless. In other words, the alleged insanity and the alleged crime must be connected, the one with the other, and the latter be the offspring of the former, in order to have the effect of rightfully declaring one irresponsible for his acts." The last clause of this instruction is deemed by counsel to be objectionable, and in relation thereto it is said: "The court should have instructed the jury that, if it was shown that defendant was substantially insane on any subject, he was entitled to an acquittal, if the evidence left a reasonable doubt in the minds of the jury as to whether the homicide proceeded from that insane condition." Omitting what is said as to a reasonable doubt, it seems to us that this is precisely what the court did say. The meaning of the court was that the defendant should not be acquitted because he was clearly insane on the subject of religion, or some other subject, if the crime was not connected with, and the offspring of, such belief. There is no evidence tending to show that the defendant was insane on all subjects, or that he was homicidally insane. If insane, he became so because of the wrong he believed the defendant did. Now, was the criminal act the offspring of the insane delusion? In other words, did he kill the deceased while insane by reason of the wrong done? This was for the jury to say, and this is the question submitted to them. The instruction is correct. The jury was properly and sufficiently instructed as to the doctrine of reasonable doubts, and we shall again have occasion to refer to the question of insanity.

III. The defendant introduced several witnesses as medical experts, and lengthy hypothetical questions were put to

3. ——: ——: and answered by them, and the defendant claims
expert testimony: that such evidence tended to sustain the defense
weight of: instruction. of insanity; and in relation thereto the court
instructed the jury as follows: "These opinions will

be of greater or less aid to you in your deliberations, depending very much on the skill, knowledge and experience of the witness, and his acquaintance with the subject under investigation. It will readily occur to you that this kind of evidence may be found quite reliable and satisfactory, or the reverse, and entitled to little, if any, consideration. It may be further remarked, too, in regard to evidence which is made up largely of mere theory and speculation, and which suggests mere possibilities, that it ought never to be allowed to overcome clear and well-established facts. In this connection, I deem it proper to say that while, perhaps, the profession of law has not fully kept pace with that of medicine on the subject of insanity, medical theorists have propounded doctrines respecting it, as an excuse for criminal acts, which a due regard for the safety of the community, and an enlightened public policy, must prevent juries from adopting as a part of the law of the land."

The objections urged by counsel are—*First*, that the "expert evidence was not made up of mere theory and speculation, but respectable physicians gave their opinions, based upon well-established principles of medical science." The respectability, knowledge and honesty of the physicians is conceded, but their evidence, was largely mere theory and speculation. They, we feel satisfied, would not claim otherwise. No man can look into the body of another, and tell certainly, if he is diseased, what caused the disease. Experience and knowledge may enable him to tell, with reasonable certainty, the nature and character of the disease, but, after all, it is theory and speculation. When, however, a physician is called on to determine whether the mind is diseased to such an extent as to make the person an irresponsible being, the task is much more difficult. Especially is this true where the opinion must be formed and based upon a hypothetical question alone. In such case, it seems to us that the opinion must, of necessity, be mere theory. This is not the fault of the profession, but because more than human

intelligence is required to solve the problem. We have no hesitation in saying that the evidence tending to show insanity is exceedingly slight. Fits while teething seem to us exceedingly remote. Counsel speak of them as of an epileptic character. There is no such evidence. The temporary insanity of the grandmother, produced by the cause above stated, is equally remote and unreliable. The instruction under consideration is materially different from that in *State v. Townsend*, 66 Iowa, 741. It that case the defendant was subject to epileptic fits of a peculiar character. The cases are so unlike that the same rule cannot be applicable to both. *Second.* The last paragraph of the instruction is also objected to. It is substantially what was said by this court in *State v. Felter*, 25 Iowa, 67, and the instruction, as a whole, is in accord with that case.

IV. In the fourth instruction the court, among other things, said: "It is not necessary that premeditation or intent to kill should have existed for any particular length of time before the killing. If it actually exists at the time of the killing, and the killing is the result of a formed and determined design to take life, * * * then the killing is willfully, deliberately and premeditatedly done, within the meaning of the law." It is said that "premeditation cannot be predicated of the present tense and present time. Actual existence at the time of the killing is not premeditation, and is not sufficient to constitute murder in the first degree." It must be conceded that there is much force in the objections of counsel. We, however, think the court undoubtedly meant that, if there was premeditation and a design to kill, formed prior to the homicide, and it existed, or continued to exist, at that time, then the crime was murder in the first degree, and we think the jury must have so understood. The court did not mean that, if the intent to kill existed at the time or instant of the homicide, this constituted the required premeditation. This, we think, is apparent from the instruction. It may be

that the words used, and the manner of using them to express the thought the court intended to convey to the jury, were not the best that could have been adopted. But the jury could not have been misled, to the defendant's prejudice, under the proven facts.

V. The court in the eighth instruction, in defining murder in the second degree, among other things, said: "When one assaults another with a deadly weapon, likely to produce death, the law presumes malice, in the absence of proof, either direct or by circumstances, to the contrary." This instruction is not in conflict with what is said in *State v. Townsend*, before cited, but is in accord therewith. In support of the objections to this instruction, counsel cite *Smith v. Com.*, 1 Duv., 224; *Donnellan v. Same*, 7 Bush, 676; *Clem v. State*, 31 Ind., 480; and *Bradley v. State*, Id., 492. In the last two, the instruction condemned was that "the intent to murder is *conclusively* inferred from the deliberate use of a deadly weapon," and in the first case cited the instruction was that, "if homicide be committed by a deadly weapon,    *    *    * the law implies malice." This was held to be erroneous, without qualification as to whether the weapon was used in self-defense, under sudden heat and provocation; and the second case cited is not materially different. A moment's consideration will show that the instruction in the present case is materially different, for the reason that the presumption in the case at bar is only allowed to prevail if there is no evidence to the contrary; that is, if it was not used in self-defense, or for a lawful purpose. The instruction is correct.

VI. The state introduced one Hackley, and proved by him that he was present on the evening when the deceased was shot. He was still living when he saw him, and he went after a physician, and when he came back he saw the body. This witness was with the deceased and the girls that day, and the day previous, when they were at Oskaloosa. He was asked by counsel for the defendant: "Where did you

*Marginal note: 5. ———: presumption of malice from deadly weapon.*

leave the girls that morning?" The question was objected to as not proper on cross-examination. The objection was sustained. It does not require any argument to show that this ruling is clearly correct.

VII. The defendant introduced several witnesses who testified that his general reputation and character as a "peaceable" man were good prior to the killing of the deceased, and there was no evidence to the contrary; and the defendant asked one Ackerman, when on the stand as a witness introduced by him: "Are you acquainted with his general character for peaceableness and quietness up to December, 1884?" This question was objected to on the ground of incompetency. The objection was sustained, but upon what ground we are not advised. But, whatever the reason may have been, no possible prejudice resulted from the ruling of the court, because, as we have seen, there was no controversy in relation to the reputation or character of the defendant as a peaceable man.

*6. EVIDENCE: exclusion of : error without prejudice.*

VIII. The defendant's mother, when on the stand as a witness in his behalf, testified that he had fits when he was two years old. She was then asked: "What effect did the fits have on him? Did they render him unconscious or not?" An objection to this question was sustained, on the ground, we may suppose, that it was not competent for the witness to give an opinion as to the effect the fits had; for the witness afterwards stated quite fully his appearance and actions when in that condition, and when it had passed off. We think the question asked was incompetent.

*7. MURDER: insanity: opinion of non-expert.*

The same witness testified that the defendant came to her house on the evening of the day the deceased was shot, but several hours afterwards, and she was asked to state what he said at that time. "Describe what you saw, and what he did. Describe the appearance of his eyes." These questions were objected to, and the objection sustained. It will be observed that

*8. EVIDENCE: questions incompetent on their face: duty of counsel.*

they relate to a time after the homicide. Ordinarily, it is undoubtedly true that what is said or done by the accused after the commission of an alleged crime cannot be shown in his exculpation. But it is said the rule ought to be different when the defense is insanity, in which case it is said that all the defendant did and said may be shown. On their face, the questions asked were clearly incompetent, and, if counsel claimed the evidence sought to be elicited had any tendency to establish insanity, he should have so stated, and what he expected to prove.

IX. Yetta Kinney, a witness introduced by the defendant, was with his sister and the deceased at Oskaloosa, at a hotel. So was one Hackley. The witness was asked by the defendant: "When you went there, what was said by Hackley, or any one, about registering?" This question was objected to by the state, and the objection sustained. Conceding that the question included the deceased, and it was sought to elicit what he said about registering, the evidence was clearly immaterial and incompetent. It is said that, as bearing on the cause of the homicide, it was material to show that the conduct of the deceased and the defendant's sister was of a criminal nature. Conceding this to be so, it would not justify the killing. But the question, on its face, had no such tendency. It was therefore incumbent on the defendant to state what he expected to prove, and thus, if he could, show that the evidence was material.

X. The court instructed the jury as follows: "In order to establish insanity, it is not necessary that the proofs shall be direct and positive, but it may be shown by such facts and circumstances as convince the mind of its existence, the same as any other fact. But when the claim set up as a defense is unusual, unnatural, and out of the ordinary course of affairs, you are not required to take the same for granted upon slight evidence, nor should you so find, except upon evidence of a reliable character, and which satisfies you that the defense has been made out." This

instruction is criticised by counsel, but we think it is correct, as applicable to the issue of insanity, or any other issue of like character, and is materially different from the instruction which was disapproved in *State v. Jones*, 64 Iowa, 356, relied on by the defendant.

XI. The court instructed the jury as follows: "If you find from the evidence, beyond a reasonable doubt, that the defendant * * * did take the life of the said James Fowler by means of the weapon described in the indictment, * * * and that the killing, if any, was done in the heat of blood or passion, upon a sudden quarrel, and upon reasonable provocation, and without malice, express or implied, and you further so find that it was not justifiable or excusable, * * * he is guilty of manslaughter, unless you find, under instructions hereafter given, that defendant was not accountable for his acts on account of insanity." This instruction is criticised at some length by counsel for the defendant, and it is said to be confused and misleading. To our minds it is not confused, but is a clear, concise and correct definition of manslaughter, as applicable to the evidence. It is clearly in accord with *State v. Shelledy*, 8 Iowa, 477; *Same v. Decklotts*, 19 Id., 447; *Same v. Abarr*, 39 Id., 185; *Same v. Spangler*, 40 Id., 365.

XII. The court instructed the jury as follows: "No mere words, however abusive or insulting, will justify an assault, or constitute sufficient provocation to reduce to manslaughter what would otherwise be murder. If the alleged homicide, if any there was, was effected with a deadly weapon, the provocation must be great, indeed, to lower the offense from murder to manslaughter." And again: "The fact, if it be a fact, that said Fowler had previously been criminally intimate, with defendant's sister, or the defendant had reason to believe he had been so intimate, would not constitute the provocation referred to in these instructions. * * *" Counsel say that it should have been left to the jury to say whether, under the circumstances,

the seduction of the defendant's sister did so provoke him as to bring the offense within the definition of manslaugher, and it is said: "This seems to us to be self-evident, and to enlarge upon it would only darken counsel by words." From this view we must dissent. To our minds the instruc-. tions are so clearly correct that argument is unnecessary.

Lastly, it is said that the verdict is not sustained by the evidence. This question is simply stated by counsel without argument. We are clearly of the contrary opinion. Because of the importance of this case, we have noticed each point made by counsel in the same order as argued by them, and have endeavored to state fully each objection made to the action of the court, with such brief reasons as we deem necessary to indicate our views; and the result is that the judgment must be

AFFIRMED.

ADAMS, CH. J., *dissenting.*—While I think that the evidence shows that the defendant was guilty of murder in the first degree, I can but think that the instruction in relation to premeditation and deliberation contains reversible error. There is a portion of the instruction which seems to me to hold that if the intent to kill, or, what is the same thing, the formed and determined design to kill, existed at the time of killing, there would be such premeditation and deliberation as the statute contemplates as necessary to make the homicide murder in the first degree. I think that the court misconstrued the decisions. They hold, clearly enough, that no particular time need elapse between the formation of the intent to kill and the act of killing, but none hold that there need be no time, or that there could be murder in the first degree where there was no intent, except such as was practically concurrent with the act. Premeditation and deliberation necessarily involve the idea of time.