### L. B. Shaffer v. The State.

No. 1857.    Decided November 13, 1912.

Rehearing denied December 18, 1912.

**1.—Burglary—Evidence—Leading Question.**

Where the bill of exceptions did not show that the question objected to was leading or suggestive and did not give the answer of the witness, there was no error; besides, the question was not leading.

**2.—Same—Evidence—Stenographer.**

Where the court would not permit the stenographer, at the request of the defendant, to read a certain question which had been asked and to which he excepted, there was no error.

**3.—Same—Evidence—Cross-Examination.**

Where the defendant objected to the court stopping him in his cross-examination and asking the witness as to when it was to get the time straight, which the witness attempted to explain, there was no error.

**4.—Same—Witness Under Rule.**

Where the court's explanation to the bill showed that the witnesses were under the rule, out of sight and hearing of the proceedings of the court, an objection that the rule had not been inforced was without merit.

**5.—Same—Evidence—Hearsay.**

Where the bill of exceptions showed that the defendant attempted to prove by his foster mother as to what he had told her, etc., there was no error in excluding same.

**6.—Same—Bills of Exception.**

Where a bill of exceptions is not in the record and another is not approved by the court, the same can not be reviewed.

**7.—Same—Evidence—Reputation of Defendant.**

Where it appeared from the record on appeal that defendant's reputation as a peaceable, quiet, and law-abiding citizen was good, there was no error to reject testimony that defendent respected the rights of others, or whether his character was that of a murderer; or of a harmless person, etc.

**8.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions did not state what the witness would have testified, there was nothing to review; besides, testimony that the defendant did not have fights when he was a boy, etc., was not admissible.

**9.—Same—Evidence—Hearsay—Self-Serving Declarations.**

Upon trial of burglary, there was no error in not permitting defendant's foster mother to testify what he told her sometime the next day after the alleged offense was committed, as to his wounds.

**10.—Same—Evidence—Declarations of Third Party.**

Upon trial of burglary, there was no error in not permitting defendant to show the conversations between third parties about finding a handkerchief, such persons not having been introduced as witnesses.

**11.—Same—Side-Bar Remarks.**

Where the court instructed the jury not to consider side-bar remarks of counsel, there was no error.

**12.—Same—Preparation for Trial—Counsel.**

Upon trial of burglary, there was no error in refusing to permit the defendant to testify that he had been in jail for some months and that he had but a few days before trial to engage counsel, etc.

**13.—Same—Evidence—Newspaper—Hearsay.**

Where defendant testified that he had no personal knowledge of the reports in the newspapers, and that all of his information was hearsay, there was no error in refusing to permit him to show what the newspapers had published of the occurrence, etc.

**14.—Same—Evidence—Opinion of Witness.**

Where the court permitted the witness to testify, to the condition of defendant when he appeared at the witness' back door, there was no error to exclude further testimony of the witness that defendant looked like an insane man; besides, the bill of exceptions was defective in not showing that any injury had occurred.

**15.—Same—Evidence—Cross-Examination.**

There was no error in permitting the State to cross-examine the defendant to show that he could not say whether his lack of remembrance was due to the lick he received, etc.

**16.—Same—Evidence—Employment of Counsel.**

There was no error in refusing to permit defendant to show that the mother of the prosecutrix paid counsel to assist the State in its prosecution.

**17.—Same—Evidence—Declarations of Defendant.**

Upon trial of burglary, there was no error in admitting testimony about defendant's condition and written declarations on the morning after the crime, in connection with defendant's plea of insanity.

**18.—Same—Expert Testimony—Insanity.**

Upon trial of burglary, where defendant interposed the plea of insanity, there was no error in not permitting defendant's expert to give an illustration of some patient, which was not in point in the case.

**19.—Same—Evidence—Cross-Examination—Experts.**

Upon trial of burglary, where defendant interposed the plea of insanity, there was no error in permitting the State, on cross-examination of defendant's expert to include in the hypothetical question the substance of the testimony of a State's witness concerning the declarations and condition of the defendant shortly after the alleged offense.

**20.—Same—Evidence—Condition of Defendant—Concussion.**

Where, upon trial of burglary, the defendant interposed the plea of insanity, and the State introduced the declarations and condition of defendant on the morning after the alleged offense, there was no error in permitting the State's witness, who was a physician and had treated defendant and dressed his wound on that morning, to testify that there was no evidence of concussion of the defendant.

**21.—Same—Charge of Court—Insanity—Concussion.**

Where, upon trial of burglary, the defendant interposed the plea of insanity, and the court submitted a charge thereon according to approved precedent, there was nothing in defendant's claim that the charge of the court restricted the insanity which would acquit defendant to a defect of reason and disease of the mind, on the ground that such insanity was caused solely by concussion and was almost instantaneous.

**22.—Same—Requested Charge—Insanity.**

Where, upon trial of burglary, defendant claimed insanity caused solely by concussion, and objected to the court's charge in restricting such insanity to a defect of reason and disease of the mind, and requested a charge that insanity such as would excuse the alleged crime is that state of mind in which the person is mentally irresponsible through loss of conscientiousness such as is normal, produced from any cause which is shown to be capable of producing it, there was no error in refusing such requested charge, the court having sufficiently charged upon that subject.

**23.—Same—Charge of Court—Night-Time Burglary.**

Where, upon trial of burglary, the evidence clearly established a night-time burglary and the indictment charged both a daytime and a night-time burglary, there was no error in the court's charge in confining the offense to a night-time burglary, although the jury fixed the higher penalty of the offense.

**24.—Same—Charge of Court—Murder—Words and Phrases.**

Where, upon trial of burglary of a private residence in the night-time with intent to commit murder, the court's charge in defining murder used the words, "every person with a sound memory and discretion, etc.," there was no error.

**25.—Same—Jury and Jury Law—Motion for New Trial—Misconduct of Jury.**

Where the record showed that the court, in hearing appellant's ground of his motion for new trial attacking a juror, heard the evidence thereon and thereafter overruled the motion, there was no error, no abuse of discretion having been shown.

**26.—Same—Bills of Exception—Practice on Appeal.**

Where not a single bill of exceptions complied with the rules, yet the

court passed upon all the questions attempted to be raised by them and found no merit therein, there was no reversible error.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of burglary; penalty, six years imprisonment in the penitentiary.

The opinion states the case.

*D. F. Rowe* and *Leonard Doughty,* for appellant.—As to the question of the court's interruption of defendant's cross-examination of a witness: Harrell v. State, 45 S. W. Rep., 581; Hopperwood v. State, 44 S. W. Rep., 841; Harris v. State, 36 S. W. Rep., 88.

As to question of excluding testimony as to communication made by defendant to witness to contradict testimony of prosecutrix: Morrison v. State, 51 S. W. Rep., 358.

As to communication of defendant to his foster mother concerning the wounds he received: Craig v. State, 18 S. W. Rep., 297; Harrison v. State, 20 Texas Crim. App., 387.

As to refusing to admit general reputation that defendant was an upright citizen: Coffee v. State, 1 Texas Crim. App., 548; Leader v. State, 4 id., 162; Jones v. State, 10 id., 552; Johnson v. State, 17 id., 565; Williams v. State, 51 S. W. Rep., 220.

In refusing testimony that defendant looked like an insane man: McClackey v. State, 5 Texas Crim. App., 320.

On question of employing private prosecuting attorneys: McGruder v. State, 33 S. W. Rep., 233; Lyon v. State, 61 S. W. Rep., 125; Mason v. State, 7 Texas Crim. App., 623; Blunt v. State, 9 id., 234.

On question of rejecting expert testimony of an illustrative case: Leach v. State, 22 Texas Crim. App., 279; Clark v. State, 40 S. W. Rep., 992.

On question of court's charge on insanity; in restricting same to a defect of reason from disease of the mind: Tubb v. State, 55 Texas Crim. Rep., 616, 117 S. W. Rep., 858; Raines v. State, 56 Texas Crim. Rep., 94, 119 S. W. Rep., 93; Sage v. State, 91 Ind., 141; Com. v. Wireback, 190 Pa. St. Rep., 138; State v. Richards, 39 Conn., 591; Leach v. State, 22 Texas Crim. App., 279; 22 Cyc., p. 1212, et seq.

On question of the court's charge on murder: Smith v. State, 1 Texas Crim. App., 516; Miles v. State, 1 id., 510; Smith v. State, 32 S. W. Rep., 696.

On question of misconduct of jurors: Gallaher v. State, 50 S. W. Rep., 388.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—The appellant was indicted for burglary in two counts. The first, daytime, and the second, night-time. Both charged that it was done with intent to murder Bertha Woodworth,

and the house burglarized was the private residence of W. W. Woodworth. The night-time count, only, was submitted. The jury convicted appellant and fixed his penalty at six years in the penitentiary.

The records in this case are voluminous. The record proper has ninety pages of typewritten matter, the statement of facts one hundred and five, and appellant's printed brief sixty-one.

In the consideration of this case and the questions raised, we have given all of these records a thorough investigation. A large number of witnesses were introduced.

While all this is true, the main questions are few. It is unnecessary to give any lengthy statement of the testimony. We will give such of it as we think is necessary to so discuss and decide the questions.

The family of W. W. Woodworth consisted of himself, his wife and his said daughter Bertha. His business and duties required him to be away from his said home in Houston, Texas, most of the time and he was there very little. The family had rented and occupied as a private residence a certain house in the city of Houston at the time and before the burglary which is charged to have been committed on December 3, 1910.

During the spring or early summer of 1910, a young man, it seems, by the name of Rogers was paying Bertha some attention. About then the appellant became acquainted with her and so manipulated as to turn her against said Rogers and caused her to dismiss him and accept appellant as her suitor. Early in July she and appellant became engaged to be married. In the latter part of November, 1911, it seems that Bertha, in some way learned that appellant in inducing her to dismiss Rogers and no longer associate with him, or receive his attentions, had misrepresented Rogers in some way and she and Rogers had then become aware of it. It seems that this, or something else, about a week before December 3, 1910, resulted in Bertha breaking the engagement of marriage with appellant, he claiming, however, that this did not occur until about the night before the offense was charged to have been committed. The burglary occurred just before, or about daylight on Saturday morning December 3, 1910, while it was still dark. Bertha testified that she saw appellant on the Thursday night before and that he then threatened to kill her for breaking their engagement. On Friday night, early in the night, she phoned to said Rogers and had him to come to her house, he reaching there about between 5 and 6 o'clock. A little later, about 7 o'clock, appellant appeared upon the scene and found Rogers there in company and conversation with Bertha. He thereupon became incensed and demanded to know what his business was there. Rogers then accused appellant of being the cause of Bertha's dismissing him, Rogers, and some words and altercation then occurred between them in the presence and in the house of Bertha and her mother. Bertha and her mother desired appellant to leave the house and upon his declining to do so, they requested Rogers to forcibly put him out of the house

which Rogers then did. Appellant claims that in this altercation and forcible ejection Rogers struck him a blow in the face on the side of the nose. Rogers, Bertha and her mother all testified that he did not strike him any blow, but they all substantially testified that he did roughly take hold of him and forcibly eject him from the house and closed the door on him. Rogers, shortly afterwards, left the house and was not in or about it any more during that night or the next day. Appellant testified that after he was thus ejected from the house that he walked up and down the sidewalk of the block in which this house was situated in the city of Houston until about or after 10 that night, and that he remembered what he did and where he went, detailing, more or less of this, but that after about 10 that night on this trial he didn't remember anything that occurred during the remainder of that night or early the next morning.

The testimony further shows, without doubt and without material contradiction, that the next morning, Saturday, December 3, 1910, just before or about daylight, and while still dark, the appellant appeared at the said Woodworth's house and attempted to get in it, but not succeeding otherwise, he kicked out one of the glass sidelights of the entrance and through that then got into said house, and thereupon went up the stairway to the second story and to the door of the room which was occupied as the bedroom of Bertha and her mother that night; that he was familiar with the house, both up and down stairs, and knew where Bertha and her mother slept; that upon reaching the bedroom door he demanded an entrance but was refused by Bertha and her mother, who were then still in bed and undressed. He thereupon proceeded to burst in the panels of the door and through this break entered the said bedroom, Bertha and her mother screaming and running, and Bertha went out of the room through one of the windows on to the second story of the front gallery, appellant following her with a black handled open razor and after her with it. That in attempting to escape from him she got outside of the banisters of the gallery, holding and clinging thereto leaning as far away from him as she could; that in some way she then fell from this gallery to the ground below, the appellant attempting to cut her all this time, causing her to fall in attempting to escape. He thereupon, hurriedly retraced his steps, went back through the window through the room and door which he had succeeded in breaking through, down the stairway out on the front gallery below, and then proceeded to cut and slash Bertha with this razor, inflicting serious wounds upon her therewith; that he cut her neck, attempted to cut her throat, cut her on top of the head, cut her finger on one hand and the thumb on the other and that in perpetrating these wounds upon Bertha he broke the edge of the razor off, part of this broken piece lodging in her hair at the wound in her head. Another piece was broken off and lodged in her finger. These pieces of the razor were found by the physicians who was at once called in to dress her wounds. She was confined to

her bed some three weeks from the wounds. By the screams of Bertha and her mother the neighborhood was aroused and some men came to where she was, the appellant thereupon fleeing. Shortly after this he went into the back premises of a neighbor of the Woodworth's and with the same razor cut his own throat, partially severing part of the wind-pipe and vocal organs. A pool of blood, the razor and a handkerchief saturated with blood were found apparently where he fell or lay down when he cut his throat. Shortly after this, he appeared at the back door of this neighbor, knocked at the door and upon her opening it, she discovered him with his hair disheveled, no hat on and blood all over him, and was so frightened that she immediately slammed and locked the door and ran from the house. Shortly afterwards he was apprehended and taken to one of the infirmaries in the city and a doctor was immediately called to attend him. The nurse or person who called this physician briefly told him the condition of the appel-lant, and he instructed the nurse to administer anaesthetics and that he would reach there as soon as he could and dress his wound and give him attention; that he shortly afterwards did appear at the infirmary, found appellant with his throat cut, as stated, and had other anaesthe-tics and morphine administered to him and proceeded to dress and sew up his wound. The razor found with the handkerchief, saturated with blood, at the pool of blood, was identified by the witnesses as the razor with which he had cut Bertha Woodworth, the witnesses fitting in the broken pieces found in her head and finger with the broken razor. The doctor, at the infirmary, dressed his wounds between 8 and 9 o'clock and just after the wounds were thus dressed and sewed up, Mr. Kessler, the chief of police, who had been called by the crime to the scene thereof soon after it occurred, appeared at the infirmary, saw appellant and talked with him about the facts of the case. He asked him questions and he replied partially vocally, though his voice was much affected by his self-inflicted wounds, but in addition to nodding his head and thus talking, he wrote briefly of what had oc-curred and then and there gave it to the chief of police. On this occasion, in substance, he told the chief of police that said Rogers had assaulted him in the early part of the night or evening before; that when he had this conversation with appellant and appellant told him these things and wrote what he did, that he was conscious and sensible and nothing was wrong with him, beyond his wounds, and while he said he couldn't speak, he told this witness about cutting this young lady and, as he understood from him, had later inflicted the wounds upon himself. The writing thus made by appellant and given to the chief of police were produced and identified. It was written or scrib-bled on pads of paper—the chief would ask him the questions and he would answer with the scribbling, or shake, or nod his head as he was asked the questions. The State thereupon introduced this writing of appellant which was as follows: "I tried, killed the girl over Mrs. Woodworth and myself, give it to the police." "I got beat up by

Rogers, he works over No. 7 fire station arrest him." This witness further testified, "When he read those things to me he made no claim he did not know what he was doing the night before; there was no pretense in his conduct there with me that he had lost his mind or was insane, or anything wrong with him the night before, he was pretty rational when talking to me." The infirmary physician who first reached him between 8 and 9 o'clock carefully examined him, washed and dressed his wounds, and he testified in substance that he examined him thoroughly and there were no other wounds or bruises on him whatever than the self-inflicted cut on his throat and there were no external signs of violence and he had no bruises or wounds on his face, nor was his face or eyes swollen.

Appellant's defense was insanity, he claiming and testifying that he knew nothing about his breaking in the Woodworth house or his assaulting or cutting Bertha or himself; that after he was ejected from the house about 7 o'clock the night before, he remembered what he did and where he went and practically all until about 10 o'clock that night and that he remembered nothing after that; that after he was ejected from the house and assaulted and struck by said Rogers the night before that he did not feel right; that he felt like something was the matter with him; that it did not occur to him to go to any of his friends or a doctor, or away from his proximity to the Woodworth house to get help or to have anything done for him; that he didn't know, while he was testifying, what was his trouble that night—what was the matter with him; that it had been so long since then that he could not swear whether his then condition was due to the lick he claimed to have received from Rogers the night before; that he didn't know what there was to cause him to just forget and everything to become a blank after 10 o'clock that night; that he didn't then, at the time he was testifying, know of anything else that could have caused it.

His foster mother testified that she did not see him until the next evening about 3 o'clock after all of this occurred on the morning before and he had been in the infirmary and his wounds dressed and sewed up about 8 or 9 o'clock that morning; that at that time—3 p. m.—the side of his face was swollen and that it was black and blue and green; that the side of his face showed the color was purple, broken and bruised; that his whole face was discolored and he had a pale, greenish appearance, as of a person having lost a great deal of blood and his swollen face had greenish streaks all over it.

While not a single one of appellant's many bills comply with the rules (sec. 857, p. 557, and sec. 1123, p. 732, of White's Code Criminal Procedure), yet we will briefly take up and pass upon the questions attempted to be raised by them.

By appellant's first bill he complains that this question was asked by the State's attorney: "You spoke of this conversation at 7:30 and then at 9:00. I don't understand, explain that," because it was lead-

ing and suggestive. The bill in no way shows that it was leading or suggestive, nor does the question. The answer of the witness is not given. This shows no error.

His next bill complains that the court would not permit the stenographer, at his request, to read a certain question which had been asked, to which he excepted. This shows no error.

The third bill contains about three and one-half pages of typewritten matter of questions and answers and colloquies between the counsel and the court, and that the court then asked this question: "When was it, let us get this time straight?" That he objected to the court stopping him in his cross-examination and asking the above question. Then the bill proceeds to show that the witness, in answer to the questions, attempted to explain. No error is shown by this bill.

By his fourth bill he complains in substance that some of the State's witnesses were in sight and hearing of the witness testifying, although the rule had been enforced and they sent out of the room. The court, in explaining the bill, states that the witnesses were in a room out of sight and hearing of the court or witnesses on the stand. This bill shows no error.

The seventh bill contains thirteen and one-third pages of typewritten matter and, among other things, shows that the appellant attempted to prove by his foster mother what he had told her about his engagement to Bertha Woodworth soon after it occurred in July, 1910, and some months before the alleged offense. We get from this bill that appellant was seeking to introduce this testimony and the court would not permit him to do it, because it was hearsay and improper. The bill shows no error whatever, but it does show a patience and long suffering by the court that should not have occurred. When appellant offered his testimony, which we think was clearly hearsay and inadmissible, it was promptly objected to by the State and the court sustained the objection, and then at appellant's instance, the court retired the jury and had a long controversy and colloquy with appellant's counsel about the matter. When the appellant offered his testimony and it was objected to by the State and the objection sustained and the evidence excluded, this should have ended the matter and the court should have proceeded with the trial, as the bill shows he repeatedly attempted to do, but was in effect prevented by appellant's attorney.

There is no eighth bill in the record and the court refused to approve his ninth bill.

By the tenth bill it is shown that appellant asked his foster mother, in substance: As thoroughly as possible the general character as she observed it, and the acts and conduct of the defendant as evincing his disposition, whether it was that of a quarrelsome or peaceable person, and whether it was that of one who respected the rights of others or whether it was that of a murderer or a harmless person—tell all about it during his whole life time. This was objected to by

the State as immaterial and irrelevant, and as attempting to prove character in the wrong way and that it was the opinion of the witness about matters that are not relative to appellant's marriage engagement to Bertha. The court sustained the objection. It is not stated what the witness would have testified. In approving the bill the court qualified it by stating that it was already proved by the witness that appellant's reputation as a peaceable, quiet and law-abiding citizen was good. By the eighteenth bill appellant attempted to prove by another witness what his reputation was as an upright citizen. And by the twentieth by another witness that his reputation was that of 'a gentle and humane disposition. These bills, and neither of them, show any reversible error.

The eleventh bill, of five pages of typewritten matter, shows that appellant attempted to prove that he did not have fights when he was a boy. And in his fourteenth that when the court would not let the witness answer certain questions along the same line, the court threatened or perhaps did, as he states in qualifying the bill, fine or punish him for contempt on account of his repeatedly refusing to abide by the ruling of the court; that all this occurred in the absence of the jury. This bill does not state what the witness would have testified. None of this shows any error.

By his fifteenth bill appellant complains that the court would not permit his foster mother to testify when he told her about 3 o'clock the next day after the crime was committed about daylight of that day, that he did not know how his wound on his throat was inflicted and that it was not self-inflicted. The court correctly sustained the State's objection to this because it was hearsay and self-serving and it shows no error.

By his seventeenth bill appellant complains that the court would not let him show the conversations between Mrs. Shepherd, appellant's foster mother, and the officers about their finding the said handkerchief saturated with blood at the pool of blood where the razor was found, the court stating that he could prove any fact by any person who knew such fact about the handkerchief but not conversations between the witness and other persons. There was no error in this.

No error is shown by appellant's nineteenth bill, wherein he complains of some sidebar remark of the State's attorney during the trial, the court stating that he instructed the jury not to consider the remarks of counsel for the State.

Nor was there any error shown in a sidebar remark by the prosecuting attorney, as complained of in his twenty-first bill.

Neither was there any error in the court refusing to permit the appellant to testify that he had been in jail for some months prior to his trial and that he had but a few days ago engaged counsel, which was done through his foster mother.

There was no error in refusing to permit appellant to show what the newspapers had published of the occurrence the day after it oc-

curred, the witness stating that he had no personal knowledge of the reports in the newspaper and that all of his information was hearsay.

There is no reversible error shown by appellant's thirty-second bill to the action of the court in refusing to permit Mrs. Miller to testify that appellant looked like he was insane when he appeared at her back door and knocked and she saw him bloody all over, etc. The court permitted the witness to testify to the condition of the appellant at the time and simply excluded her expression that he looked like an insane man. Besides, this bill does not in any way give such a statement of the case or questions as to show this court that any injury whatever has occurred to him thereby. The court correctly held that the State had a right in cross-examination of the appellant to have him testify, in substance, that he could not say whether his lack of remembrance after 10 o'clock the night of the assault was due to the lick he received as complained in appellant's bill No. 33.

Nor did the court err in refusing to permit appellant, as complained in his bill No. 34, to prove that Mrs. Woodworth, Bertha's mother, paid a large fee to Messrs. Lane, Walters & Storey, attorneys, to prosecute him.

Nor did the court err in permitting the witness Kessler, the chief of police, to testify about appellant's condition and his writing and delivering what he did to him on the morning after the crime, as substantially stated in the statement above, as complained by appellant in his thirty-fifth bill.

Nor did the court err, as complained in his thirty-seventh bill, in not permitting his expert Doctor Ross, to give an illustration of some patient, which was not in point in this case.

His bill No. 39, complaining that the court erred in cross-examination of his expert Doctor Ross, in permitting the State to include in the hypothetical question the substance of the testimony of the chief of police, shows no error.

Nor did the court err in permitting the State's witness Dr. Green, who treated appellant and dressed his wounds the morning of his cuts, to testify that there was no evidence of concussion of the appellant.

The court, in this case, gave a correct charge on insanity, strictly in accordance with charges on the subject which this court has many times and uniformly approved as a correct charge on that subject. (Nugent v. State, 46 Texas Crim. Rep., 67; Hurst v. State, 40 Texas Crim. Rep., 378; Cannon v. State, 41 Texas Crim. Rep., 467; Tubb v. State, 55 Texas Crim. Rep., 616, and many other cases might be cited but it is unnecessary.) In his motion for new trial he complains of this charge, because he claims it was error "in restricting the insanity which would acquit defendant in this case to 'a defect of reason and disease of the mind;' whereas, the insanity shown to exist in this case, if defendant did commit the act, was caused solely by concussion, and was almost instantaneous, and was not such as would com-

monly be called a 'disease,' and the jury were wholly misled by the charge into believing that they could not acquit on account of such insanity as was described by Dr. F. B. Ross, which they could not have understood as a 'disease,' and they were thereby misled to the prejudice of the defendant. And this especially in view of the fact that the correct proposition of law was called to the attention of the court in defendant's special charge No. 1, which should have been given." This special charge is to this effect: "Insanity such as will excuse the crime alleged herein, is that state of mind in which the person is mentally irresponsible through loss of consciousness such as is normal, produced from any cause which is shown to be capable of producing it."

The evidence in this case, without question and without doubt shows that appellant's mind, for all his life previous to the time of the commission of this crime and afterwards, was that of a normal, ordinary sane person. The effect of his testimony on the subject is that for some cause unknown to him and for which he can not account, he, at the time he testified in this case, could not remember what occurred from about 10 o'clock, the early part of the night of December 2, 1910, till after he, late in the evening of the next day, realized that he was in the infirmary with his throat cut, and he claimed that he had been struck in the face by the side of the nose about 7 o'clock the night before by said Rogers in the house of Mrs. Woodworth and in the presence of her and her daughter, Bertha. Rogers, Mrs. Woodworth and Bertha testified Rogers did not then strike him as claimed by him. Then he put Dr. F. B. Ross on the stand who sufficiently showed that he was an expert and he was asked a long hypothetical question, purporting to recite from appellant's standpoint, all of the testimony tending to sustain his contention and then the said doctor was asked: "If you know in your professional and scientific mind, whether the action of such an assault comports with that of a sane or insane mind?" He answered, "Up to the time of injury to himself, the blow on the head, I will say there would be no question about the soundness of mind. Now, it is possible for a blow of that kind to create a concussion and there are different degrees of concussion and one suffering from concussion might do acts that were utterly at variance with his former character." He further shows, in his testimony, that, as a matter of opinion, it was a very difficult question to answer; that the way the question was put there were two possibilities, the symptoms related in the question were symptoms of a concussion, but on the other hand, angry and ordinary human emotions might prompt the same thing. That the symptoms of concussion which were detailed to him in the question, were not explained completely so as to show the proper effects of a concussion, and that several requisites of such effect are wholly lacking in the question.

Then the same witness, in answer to the State's hypothetical question, states that he would answer that the appellant was not insane.

Whart. Crim. Ev., vol. 1 (10 ed.), sec. 417d, says: "In all cases where medical experts are called as witnesses, their testimony should be received with great caution, and like opinions from neighbors and acquaintances should be regarded as of little weight if not well sustained by reasons and facts that admit of no misconstruction, and supported by authority of acknowledged credit. And in all cases the amount of reliance to be placed upon such an opinion depends upon the means of judging of the mental condition of the person, and the facts upon which such opinion is based." In note 2, cited from this text, he also cites with approval what Judge Maxwell says in 26 Neb., 639: "Ordinary medical expert testimony in regard to insanity, particularly where graduates of different schools of medicine are pitted against each other, is of the most unreliable character." And a Mississippi case, 53 Miss., 367: "It was said that medicine not being an exact science, the testimony of a medical witness on the question of sanity or insanity is at best of an exceedingly unsatisfactory character, and is often as much calculated to mislead, as to guide to a correct conclusion."

In section 417e, Mr. Wharton says: "Thus, in those jurisdictions where the right and wrong test obtains in insanity, and such inquiry is permissible and proper, the fact that a person is unable to discriminate between right and wrong is best ascertained, not by the opinion of any medical witness nor by any medical theory, but by the acts of the individual himself. And such acts and conduct on the part of one accused of crime, showing conclusively that he had sufficient reason to contemplate the act that he did and its consequences at the time he did it, are of more value as evidence on the question of capacity than the opinions of witnesses, however learned or experienced they may be." And in note 2 he approves what was said in 61 Mo., 295, "And where the mental capacity is thoroughly established by evidence other than by hypothetical reasoning of experts, their mere speculation on the subject is entitled to but little weight." And in 70 Iowa, 442: "And expert testimony in a prosecution for crime which is made up largely of mere theory and speculation, and which suggests mere possibilities, ought never to be allowed to overcome clear and well-established facts."

In the recent work of Legal Medicine, by Stewart, sec. 142, he says: "We now know that insanity is a disease, just as much as typhoid fever, and that frequently we can trace its rise, progress, culmination and disappearance. We should never forget this, but treat it as a disease and those suffering from it as other patients, diagnosing their symptoms and treating them as sick people requiring the best of care."

14 Cyc., 385, defines disease as: "Any derangement of the functions or alteration of the structure of the animal organs; a morbid condition, resulting from some functional disturbance or failure of the physical function which tends to undermine the constitution." All of the authorities on insanity treat it and discuss it as a mental disease —a disease of the mind. As a matter of fact it is a mental disease

whatever the cause, and however long or short the duration. Clearly so, as distinguished from a disease of the hands or feet or lungs or stomach, or any other disease of the body other than the mind.

Clearly, in our opinion, the special charge requested by appellant, above quoted, is not the law and should not have been given and that the charge complained of is correct and was not subject to the criticism made on it by appellant and did not and could not have prejudiced appellant's rights as claimed by him. (Code Criminal Procedure, 743.)

The court did not err in submitting only the second count in the indictment. The evidence clearly established night-time burglary as contradistinguished from a daytime burglary and the court charged the jury in effect that if it was not a night-time burglary, submitting the requisites thereof for a finding, to acquit appellant. The jury did not fix the lowest punishment for night-time burglary, but fixed a higher penalty.

There is nothing in appellant's contention criticising the charge of the court in defining murder, in quoting the statutory definition thereof: "Every person with a sound memory and discretion, etc."

The record shows that the court, in hearing appellant's ground of his motion for new trial attacking the juror Lawrenson, heard evidence thereon and after hearing the evidence overruling the motion. No error is shown in this.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied December 18, 1912.—Reporter.]